897 P.2d 234

Christopher COYAZO, Plaintiff–
Appellant,

v.

STATE of New Mexico, Twelfth Judicial
District Attorney's Office, and Twelfth
Judicial District Office of the Public
Defender, Defendants–Appellees.

No. 15311.

Court of Appeals of New Mexico.

May 2, 1995.

Christopher Coyazo, Santa Fe, pro se.

Mark A. Basham, Risk Management–Legal, Santa Fe, for defendants-appellees.

## OPINION

BUSTAMANTE, Judge.

The district court dismissed Christopher Coyazo's (Coyazo) "Complaint for False Imprisonment" pursuant to a SCRA 1986, 1–012(B)(6) (Repl.1992) motion. Coyazo presents two issues on appeal. First, whether the law enforcement officer exception under the Tort Claims Act applies to the district attorney's office when it acts in its prosecutorial capacity. NMSA 1978, § 41–4–12 (Repl. Pamp.1987). And, second, whether the immunity granted public defenders violates Coyazo's right to equal protection by depriving him of a legal remedy against his attorney. We affirm.

### FACTS AND PROCEDURAL POSTURE

A motion under SCRA 1–012(B)(6) to dismiss for failure to state a claim upon which relief may be granted tests the legal sufficiency of the complaint. *McNutt v. New Mexico State Tribune Co.*, 88 N.M. 162, 165,

538 P.2d 804, 807 (Ct.App.), *cert. denied,* 88 N.M. 318, 540 P.2d 248 (1975). We accept as true all facts well pleaded in the complaint and consider only whether Coyazo might prevail under any state of facts provable under the claim. *California First Bank v. State,* 111 N.M. 64, 66, 801 P.2d 646, 648 (1990).

Applying that standard, the complaint reveals the following facts: Coyazo was charged with second degree murder in 1983 by the District Attorney for the Twelfth Judicial District. Coyazo was represented by the public defender's office. In the course of prosecuting the second degree murder charge, the district attorney initiated a supplemental information charging Coyazo with being an habitual offender and thus subject to enhanced sentencing. The district attorney offered Coyazo a plea bargain that required him to accept a sentence for the second degree murder charge and additional incarceration time for being an habitual offender. Coyazo was required to agree that the sentences would run consecutively.

Coyazo accepted the conditions of the plea bargain only upon the advice of the public defender. The public defender advised Coyazo that all the necessary elements of the charged offenses could be proven and that the plea bargain was appropriate. He was sentenced to nine years for the second degree murder charge and eight years for the habitual offender offense, with the sentences to run consecutively. Pursuant to the plea, Coyazo was transferred on December 6, 1983, to the Department of Corrections and commenced serving a seventeen-year sentence. While incarcerated, Coyazo requested an inmate legal assistant to review his record. The legal assistant discovered that Coyazo's situation did not meet the criteria for being an habitual offender and that the plea and sentence for the habitual offender offense was inappropriate.

Coyazo prepared and filed a petition for writ of habeas corpus contesting the manner in which he was charged, prosecuted, and sentenced. On April 26, 1991, the district court granted Coyazo relief pursuant to his petition and entered an amended judgment and sentence. The amended judgment and sentence reduced the habitual offender sentence from eight years to four years, for a total sentence of thirteen years. The erroneous addition of four years to Coyazo's original sentence resulted in Coyazo being incarcerated for approximately seventeen months longer than he would have been had the initial sentence been calculated correctly. But for the incorrect imposition of an eight year habitual offender sentence, Coyazo would have been released from prison on January 13, 1990. As a result of the incorrect original sentence, Coyazo was not released until June 13, 1991.

Coyazo asserts that the district attorney acted maliciously and knowingly in offering a plea bargain which included more habitual offender time than allowed under applicable statutes. Coyazo also asserts that the district attorney's office and the public defender knew or should have known that the plea bargain and the imposition of eight years for the habitual offender status was improper and incorrect.

Coyazo filed a pro se "complaint for false imprisonment" on June 24, 1993.[1] Coyazo asserted four theories of recovery, including the "common-law tort of false imprisonment," deprivation of his right to liberty in violation of Article II, Section 18 of the New Mexico Constitution, deprivation of his due process rights under the Fourteenth Amendment to the United States Constitution, and violation of his right to be protected from cruel and unusual punishment under the Eighth

---

1. Coyazo named the "State of New Mexico, Twelfth Judicial District Attorney's Office and Twelfth Judicial District Office of the Public Defender" as defendants. No allegation was made in the complaint which specifically implicated the State of New Mexico as an entity. We assume the State was named as a matter of form and completeness. The State was not a necessary or proper party given the allegations in the complaint. *See Abalos v. Bernalillo County District Atty's Office,* 105 N.M. 554, 559, 734 P.2d 794, 799 (Ct.App.), *cert. quashed,* 106 N.M. 35, 738 P.2d 907 (1987); *Begay v. State,* 104 N.M. 483, 486–87, 723 P.2d 252, 255–56 (Ct.App. 1985). The District Attorney's office and the Public Defender's office are generally referred to as the "district attorney" and "public defender," respectively. They are collectively referred to as the "Defendants."

Amendment to the United States Constitution.

Defendants filed a motion to dismiss pursuant to SCRA 1–012(B)(6) asserting generally that they enjoyed immunity under the New Mexico Tort Claims Act as to the state law claims.[2] Apparently Coyazo argued to the trial court that the law enforcement officer exemption from the blanket grant of sovereign immunity, under the Tort Claims Act, was applicable to both the public defender and the district attorney. The trial court rejected the argument as to both parties. On appeal, Coyazo has refined his claims and does not argue that the law enforcement officer exception applies to the public defender.

For purposes of the appeal, we have construed Coyazo's complaint in the broadest context appropriate under SCRA 1986, 1–008 (Repl.1992). We are not convinced that the complaint filed by Coyazo pleads a cognizable false imprisonment claim against the public defender. However, the complaint can broadly be read to assert a professional malpractice claim against the public defender. The type of state law claim made is not crucial, however, to the analysis or the result.

## THE DISTRICT ATTORNEY CLAIMS

Coyazo makes an intriguing argument that the district attorney's office comes within the law enforcement officer exception from immunity under the Tort Claims Act. Section 41–4–12. Coyazo acknowledges that for the district attorney's office to come within the statutory definition of "law enforcement officer," he must be able to show that the district attorney's principal duties are "to hold in custody any person accused of a criminal offense, [and] to maintain public order or to make arrests for crimes ..." NMSA 1978, § 41–4–3(D). Coyazo concedes that the principal activities of a district attorney do not include holding in custody persons accused of criminal offenses or making arrests for crimes. Coyazo aptly states the issue by saying that the "sole question is whether the district attorney's office's principal duties under [the] law are 'to maintain

public order.'" He then engages in an *a fortiori* argument which has surface appeal, but which must ultimately fail.

Coyazo observes that there can be little question that individuals committing criminal acts create disorder in the community. One of the principal statutory duties of the district attorney is to prosecute criminal cases on behalf of the State. Prosecution of criminal cases includes determining whether and which charges, if any, to file against individuals, prosecuting the charges through the courts, and upon receiving a conviction, ensuring that appropriate sentences are imposed. NMSA 1978, § 36–1–18 (Repl. Pamp.1991). Coyazo argues that by prosecuting criminals and deterring persons from criminal activity, the district attorney of necessity is involved in maintaining public order as defined in Section 41–4–3(D). Coyazo then asks us to take judicial notice of the fact that district attorneys in general spend most of their time prosecuting criminal cases in the district courts.

We reject Coyazo's invitation to stretch the definition of "law enforcement officer" to include district attorneys in their prosecutorial role. This Court has addressed the status of district attorneys and their staffs under the Tort Claims Act twice before. *Abalos v. Bernalillo County District Att'ys Office*, 105 N.M. 554, 734 P.2d 794 (Ct.App.1987); *Candelaria v. Robinson*, 93 N.M. 786, 606 P.2d 196 (Ct.App.1980). Neither case purports to state a universal rule of immunity in favor of district attorneys under the Tort Claims Act, and neither case provides a definitive answer to the issue presented here. In addition, *Candelaria* and *Abalos* are both factually distinguishable. *Candelaria* arose as a claim for defamation and did not involve in-court prosecutorial conduct. *Abalos* involved the failure of the district attorney staff to properly process and deliver paperwork from the grand jury to the county detention facility resulting in the early release of a prisoner who attacked the plaintiff a few weeks later. Neither *Candelaria* nor *Abalos* addressed the applicability or effect

---

**2.** Defendants also addressed any possible claims Plaintiff might be able to assert under 42 U.S.C. § 1983. Coyazo has not appealed the dismissal

of any federally based claims he might have. Dismissal of the federal law claims is thus final.

of the specific portion of the definition of "law enforcement officer" upon which Coyazo relies.

*Abalos* does indicate, however, that when analyzing the potential liability of district attorneys, the definition of "law enforcement officer" should be analyzed under the same approach used with other similar claims. That is, the primary inquiry concerns review of the employee's day-to-day duties, responsibilities, and activities. These duties and responsibilities are then measured against the admittedly amorphous standard of the duties and activities traditionally performed by law enforcement officers.

Coyazo does not include any allegations in his complaint describing any conduct or activities by the district attorney's office outside of the normal activities undertaken by attorneys in a judicial setting. We can assume, for purposes of this opinion, that district attorneys and their lawyer assistants are primarily involved in lawyerly activities concerning the prosecution of criminal offenses being brought and argued in a judicial forum. The inquiry then becomes whether or not the judicial and prosecutorial activities of district attorneys and their staffs can be considered traditional duties of law enforcement officers.

We think not.

Prior case law in New Mexico again is helpful, but not definitive. The New Mexico cases examining the notion of traditional duties of law enforcement officers involve persons and entities closely involved with the pre-indictment and post-judgment phases of the broad range of activities which in every day parlance could be included within the rubric of "law enforcement." For example, *Methola v. County of Eddy*, 95 N.M. 329, 622 P.2d 234 (1980), involved a county sheriff, his deputies, and the jailers at a county jail. *Anchondo v. Corrections Department*, 100 N.M. 108, 666 P.2d 1255 (1983), involved the Secretary of Corrections and a state penitentiary warden. The sheriff, his deputies, and the jailers in *Methola* were found to be law enforcement officers based on their day-to-day activities dealing with criminal suspects, arrestees, and convicted criminals in custody. The Secretary of Corrections and the prison

warden were found not to be law enforcement officers in *Anchondo* because their day-to-day activities involve primarily administrative matters not directly or physically connected with the handling and care of suspects, arrestees, or convicted criminals. *See also Callaway v. N.M. Dep't of Corrections*, 117 N.M. 637, 641, 875 P.2d 393, 397 (Ct. App.), *cert. denied*, 118 N.M. 90, 879 P.2d 91 (1994). In *Abalos*, this Court found that the director of a county detention center was a law enforcement officer under the Tort Claims Act because his day-to-day activities were more analogous to the activities of the sheriff, deputies, and jailer in *Methola* than to the warden in *Anchondo*. *See Abalos* 105 N.M. at 560, 734 P.2d at 800.

In *Vigil v. Martinez*, 113 N.M. 714, 721, 832 P.2d 405, 412 (Ct.App.1992), we determined that parole officers and their supervisors are not law enforcement officers under the Tort Claims Act. The holding in *Vigil* was based on our view that a probation officer's primary duties did not fit the definition because probation officers do not hold persons accused of criminal offenses in custody, nor are they involved in making arrests for crimes. Quite the opposite, the probation officer's post-judgment or post-release work with parolees or probationers is primarily devoted to rehabilitation efforts. The probation officer's day-to-day activities simply did not feel like "traditional law enforcement activities." *Id.* at 720, 832 P.2d at 411.

Defendants in their answer brief assert that maintenance of public order requires *physical* action to correct situations that disturb the peace, citing *Baptiste v. City of Las Cruces*, 115 N.M. 178, 180–81, 848 P.2d 1105, 1107–08 (Ct.App.1993). We believe Defendants go too far in this assertion, but it is at least partially accurate. Defendants' position points to a unifying concept explaining the holdings in *Methola, Anchondo, Abalos, Vigil,* and *Baptiste*. That is, a comparison must be drawn between the primary activities of the public employee in question and the normal, commonplace activities of, for example, a police officer on patrol or a detention facility guard engaged in handling prisoners on a day-to-day basis. These examples are for illustrative purposes only and should not be

relied upon to unduly limit the type of activities which may come within the penumbra of traditional law enforcement activities. We cannot, and should not, attempt to provide an exhaustive list of activities that fit within the law enforcement mold. Determination in each case is fact specific, but informed by a practical, functional approach as to what law enforcement entails today.

Applying this practical approach, it is clear that district attorneys and their staffs are not engaged in the same activities as the officer on patrol when involved in the judicial phase of the criminal process.

## PUBLIC DEFENDER CLAIM

As noted above, we interpret Coyazo's complaint to state a claim for professional malpractice against the public defender. It is unclear from the record whether the public defender who represented Coyazo was a permanent employee of the public defender's office, or if he was appointed and provided services under a contract as a private practitioner. We considered remanding for clarification of this one point. We determined not to remand, however, because the status of the attorney does not directly impact on the issue Coyazo raises on appeal. In addition, the Defendant "Twelfth Judicial District Office of the Public Defender" has not raised any issue either in the answer below or in the briefs before us as to the propriety of the parties named. We determine to deal with the equal protection issue raised by Coyazo on its merits.

If Coyazo's attorney was a regular employee of the public defender's office, he would be a "public employee" and come within the ambit of the Tort Claims Act. Section 41–4–3(E). We find no waiver provision within the Tort Claims Act which would allow a professional malpractice claim against a public defender attorney when representing a client in a judicial proceeding.

If Coyazo's attorney was a contractor with the public defender's office, he would nonetheless be protected, but under the provisions of the Indigent Defense Act. NMSA 1978, § 31–16–10 (Repl.Pamp.1984 & Cum. Supp.1994); *Herrera v. Sedillo,* 106 N.M. 206, 207, 740 P.2d 1190, 1191 (Ct.App.1987) (reading the Public Defender Act, NMSA 1978, §§ 31–15–1 to –12, and the Indigent Defense Act, NMSA 1978, §§ 31–16–1 to –10 (Repl.Pamp.1984 & Cum.Supp.1994), in *pari materia* and granting immunity under the Indigent Defense Act in favor of attorneys appointed under the Public Defender Act). Section 31–16–10 states: "No attorney assigned or contracted with to perform services under the Indigent Defense Act ... shall be held liable in any civil action respecting his performance or nonperformance of such services."

Given the clear application of either the Tort Claims Act or the Indigent Defense Act, each of which provide complete immunity from suit, our inquiry would normally end here. However, Coyazo asserts that depriving him of all legal remedies against his attorney violates his right to equal protection. The issue presented is whether the legislature can completely bar a cause of action by indigent criminal defendants against the public defender, or private attorneys working under contract to the public defender, without running afoul of constitutional guarantees of equal protection under the New Mexico and the United States Constitution. *See* U.S. Const. amend. XIV, § 1; N.M. Const. art. II, § 18. This constitutional challenge has not been raised before in this particular context, and it requires legal analysis.

Coyazo asserts that the State has drawn a distinction on impermissible grounds. Specifically, Coyazo maintains that he should not be prevented from suing his attorney for malpractice just because he is indigent and must rely on counsel provided by the State. The public defender counters that immunity serves a legitimate public purpose in a rational manner and, thus, must be upheld.

The parties dwell at length in their respective briefs on the appropriate standard to be applied in assessing Coyazo's equal protection challenge. Coyazo naturally urges us to apply the intermediate standard articulated by our Supreme Court in *Trujillo v. City of Albuquerque,* 110 N.M. 621, 623, 798 P.2d 571, 573 (1990) and *Richardson v. Carnegie Library Restaurant,* 107 N.M. 688, 698, 763 P.2d 1153, 1163 (1988). Defendants, just as

naturally urge us to apply the rational basis test used by this court in *Garcia v. Albuquerque Public Schools Board of Education,* 95 N.M. 391, 393, 622 P.2d 699, 701 (Ct.App. 1980) (holding that under a rational basis approach the Tort Claims Act grant of complete immunity to teachers and public school districts for claims arising from student disciplinary actions is constitutional), *cert. quashed,* 95 N.M. 426, 622 P.2d 1046 (1981). The contours of the various standards used by the courts to test the constitutionality of legislative enactments are fully explained in the very recent case of *Alvarez v. Chavez,* 118 N.M. 732, 886 P.2d 461 (Ct.App.1994) and need not be repeated here.

The choice of the appropriate standard of review brings into focus competing and potentially contradictory lines of authority. Our Supreme Court recognizes that the interest of injured tort victims in the recovery of compensation for their injuries is worthy of something more than mere rational basis analysis. Our Supreme Court addressed the issue in *Richardson* involving wholly private litigants, and in *Trujillo* involving claims against public entities and subject to the Tort Claims Act. However, as we noted in *Alvarez,* our Supreme Court's thought on this issue is in some state of flux.

On the other hand, we recognize that indigency, in and of itself, has not been previously deemed a sensitive enough criterium to merit anything other than rational basis review. *See Harris v. McRae,* 448 U.S. 297, 323, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980) (sustaining Medicaid denial for even therapeutically necessary abortions for poor women); *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 127–30, 93 S.Ct. 1278, 1345–46, 36 L.Ed.2d 16 (1973) (upholding constitutionality of property tax system resulting in large disparities between school districts in the amount of money spent per child); *Clark v. Prichard,* 812 F.2d 991, 995 (5th Cir.1987) (no fundamental right to public assistance); *See generally* 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law—Substance and Procedure* § 18.25 (2d ed. 1992).

We resolve the issue by assuming, without deciding, that the New Mexico Supreme Court would apply at least the heightened rational basis test applied in *Alvarez.* The Supreme Court's recognition of the importance of the interest in compensation for tortiously caused harm calls for "more study than the *de facto* non-scrutiny of traditional rational basis." *Alvarez,* 118 N.M. at 738, 886 P.2d at 467. We, of course, undertake review of the immunity classification imposed by the legislature in favor of public defenders with all due respect and deference to legislative judgment. However, our analysis does not begin with a presumption of constitutional validity. *See Richardson,* 107 N.M. at 695, 763 P.2d at 1160.

The state is constitutionally required to provide indigent criminal defendants with representation. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The Indigent Defense Act was apparently the first legislative response in New Mexico to the constitutional obligation imposed under *Gideon.* The Indigent Defense Act recognizes the right of indigent defendants to representation in matters involving "serious crime" at "all stages of the matter beginning with the earliest time when a person providing his own counsel would be entitled to be represented by an attorney." Section 31–16–3(B)(1). The Act also provides a mechanism for identifying persons eligible for representation, a mechanism for appointment of attorneys to provide representation services, and clearly contemplates that representation would be provided by a combination of appointed and contracted attorneys. It was in this context that the legislature provided immunity for attorneys "assigned or contracted with" to represent indigents. Section 31–16–10.

In 1973, the legislature enacted the Public Defender Act. The Public Defender Act created the Public Defender Board and a Public Defender Department of state government with an administrative chief charged with the responsibility of overseeing representation of indigent criminal defendants. Section 31–15–1 to –12. Under the Public Defender Act, employees of the Public Defender Department are clearly public employees within the definition of the Tort Claims Act. NMSA 1978, § 41–4–3(E) (Repl.Pamp.1989). Just

as clearly, the Public Defender Department is a "state agency" within the meaning of the Tort Claims Act. Section 41–4–3(G). Between them, the Indigent Defense Act and the Tort Claims Act provide complete immunity for all possible professional malpractice claims against attorneys providing criminal defense representation for indigent persons.

It is undeniable that the indigent criminal defendant is deprived of a possible claim and remedy against his/her attorney; a possible claim which would be available to a fee paying client. However, this does not automatically lead to the conclusion that the indigent defendant has been deprived of equal protection in a constitutional sense. We must inquire whether there is an adequate basis in fact or law for the challenged classification.

The public defender argues compellingly that immunity—in its favor as an entity, as well as contracted and appointed attorneys—is adequately supported by law and fact to warrant the classification. As noted above, provision of a defense to indigent criminal defendants is constitutionally imposed on the State. Economically efficient and representationally effective provision of that service is obviously an important governmental interest. Immunity advances indigent defense services in a number of ways. Immunity encourages participation by private attorneys in the contract and appointment scheme which provides a significant percentage of attorney time devoted to indigent defense. Attorneys are assured of not having to deal with the threat of civil litigation atop a practice which consists of clients they are not free to choose or refuse. Immunity tends to encourage counsel to exercise fully independent professional judgment and discretion without fear of "Monday morning quarterbacking" in a civil context. Freedom from civil damages allows a private attorney to maintain, or at least lower, malpractice insurance costs. Maintenance of the private attorney cadre, in turn, lessens the state's requirement for full time employees in the Public Defender Department. Indigent defendants as a class are benefited because more attorneys are encouraged and likely to participate in indigent defense work. *See Minns v. Paul,* 542 F.2d 899 (4th Cir.1976), *cert. denied,* 429 U.S. 1102, 97 S.Ct. 1127, 51 L.Ed.2d 552 (1977); *Brown v. Joseph,* 463 F.2d 1046 (3rd Cir. 1972), *cert denied,* 412 U.S. 950, 93 S.Ct. 3015, 37 L.Ed.2d 1003 (1973). Finally, immunity of necessity protects the public treasury. *See* Ruth L. Kovnat, *Torts: Sovereign and Governmental Immunity in New Mexico,* 6 N.M.L.Rev. 249 (1976). These same considerations apply, though often to a lesser extent, to regular full time employees of the Public Defender Department.

These are all demonstrable and substantial benefits derived from the provision of immunity to public defenders. They provide an adequate basis upon which to support denial of a potential professional malpractice claim to indigent criminal defendants.

Our decision in this case has been hampered somewhat by a lack of precedent in New Mexico and other jurisdictions. The parties cited and argued the great majority of the cases available which allude to the equal protection implications of providing public defenders immunity from malpractice liability. We have reviewed the cases, but have not found them helpful to resolution of the issue under New Mexico's statutory provisions. Cases cited by Coyazo from other jurisdictions either do not discuss specific statutory provisions such as those involved here or only involve statutes peculiar to their own jurisdiction. For example, the court in *Windsor v. Gibson,* 424 So.2d 888 (Fla.Dist. Ct.App.1982) (per curiam), discussed equal protection concerns the court had with public defender claims of immunity. However, the court there was concerned with concepts of common law judicial immunity not directly related to any statutory provision or to sovereign immunity concepts. Similarly, *Reese v. Danforth,* 486 Pa. 479, 406 A.2d 735 (1979), revolved around the definition of a "public official" under Pennsylvania law and did not deal directly with statutory provisions such as those found in New Mexico. In *Donigan v. Finn,* 95 Mich.App. 28, 290 N.W.2d. 80 (1980), involved only appointed counsel and did not discuss an immunity statute. The defendants in *Donigan* argued a qualified immunity defense similar to that found in cases construing the application of federal liability under 42 U.S.C. § 1983.

Our own review revealed a small number of cases in which immunity for public defenders was upheld in the face of equal protection challenges. Again, these cases do not provide definitive guidance and resolution of the issues presented to us. However, they are helpful in their holdings, if not their analysis. *See Dziubak v. Mott*, 503 N.W.2d 771 (Minn. 1993) (approving immunity under general policy grounds, not statutory provisions); *Browne v. Robb*, 583 A.2d 949 (Del.1990), *cert. denied*, 499 U.S. 952, 111 S.Ct. 1425, 113 L.Ed.2d 477 (1991); *Ramirez v. Harris*, 105 Nev. 219, 773 P.2d 343 (1989) (per curiam).

The trial court is affirmed.

IT IS SO ORDERED.

BLACK and BOSSON, JJ., concur.