832 P.2d 405

**Ida VIGIL, as Personal Representative of the Estate of Robert P. Vigil, Deceased, Plaintiff–Appellant,**

v.

**Juanita MARTINEZ, Individually; Manuel E. Sandoval, Individually; Robert Squaglia, Individually, Defendants–Appellees.**

**No. 12131.**

Court of Appeals of New Mexico.

March 18, 1992.

---

OPINION

HARTZ, Judge.

While on supervised probation, Toby R. Sanchez, Jr., (Probationer) murdered Robert P. Vigil (Victim) during the night of May 26–27, 1987. Plaintiff is the personal representative of Victim's estate. Defendant Juanita Martinez was Probationer's probation officer. Manuel Sandoval was Martinez's supervisor and head of the Las Vegas probation office, where Martinez worked. Robert Squaglia was state director of probation. Plaintiff sued Defendants under the Federal Civil Rights Act, 42 U.S.C. Section 1983 (1988), and the New Mexico Tort Claims Act, NMSA 1978, Sections 41–4–1 to –27 (Repl.Pamp.1986). The district court dismissed the first amended complaint (the Complaint), holding that the Complaint failed to state a claim under the Civil Rights Act and that Defendants were immune under the Tort Claims Act. We agree and affirm.

CIVIL RIGHTS CLAIM

■ When we review an order dismissing a complaint for failure to state a claim, we assume the truth of the allegations of the complaint. *Bottijliso v. Hutchison Fruit Co.*, 96 N.M. 789, 635 P.2d 992 (Ct. App.1981). According to the Complaint, on May 26, 1987, Probationer, Victim, and several others spent the late afternoon and evening together and consumed a large amount of alcohol. They retired to a mobile home, where all but Probationer went to sleep. During the night Probationer murdered Victim by slitting his throat. The Complaint alleges that the murder was caused by Martinez's gross negligence and callous indifference to the supervision of Probationer. Martinez's alleged misconduct included failing to place Probationer under strict probation, failing to place Probationer in a 30–day inpatient alcoholism treatment program as required by his sentence, failing to periodically screen Probationer for substance and alcohol use as required by the sentence, failing to monitor Probationer to ensure compliance with the conditions of probation, failing to maintain personal contact with Probationer and conduct a field visit, failing to obtain from

Luis B. Juarez, Las Vegas, for plaintiff-appellant.

Janet Clow, M. Karen Kilgore, White, Koch, Kelly & McCarthy, P.A., Santa Fe, for defendants-appellees.

Probationer written verification of compliance with the conditions of his probation, and failing to monitor Probationer's health needs, including his use of asthma medication, and to advise Probationer of the risk of temporary insanity from combining use of the asthma medication and alcohol. The Complaint alleges that Defendant Sandoval caused the murder by his gross negligence and callous indifference in the supervision of Defendant Martinez and that Defendant Squaglia caused the murder by his gross negligence and callous indifference in supervising Probationer and directing the work of Defendants Sandoval and Martinez.

To recover under Section 1983, Plaintiff must allege acts and omissions of Defendants that deprived him of a federal right. *See Garcia v. Las Vegas Medical Ctr.*, 112 N.M. 441, 443–44, 816 P.2d 510, 512–13 (Ct.App.1991). Plaintiff has not suggested the violation of any federal right other than the right to due process protected by the Fourteenth Amendment to the United States Constitution.

The Complaint, however, does not allege facts that constitute a violation of due process. The essence of Plaintiff's claim is that Defendants did not take proper steps to protect Victim from Probationer. The Complaint does not allege, and Plaintiff's briefs on appeal do not suggest, that Defendants in any way restricted Victim's freedom to act to protect himself. Because the State did not limit the freedom of action of Victim, it did not violate his right to due process.

This conclusion is compelled by the United States Supreme Court decision in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). When Joshua DeShaney was four years old, his father beat him so severely that he will probably spend the rest of his life in an institution for the profoundly retarded. He sued several social workers, other local officials, Winnebago County, and its Department of Social Services because of their failure to take action despite their knowledge of the threat to him posed by his father. Although the Department of Social Services had entered into an agreement with Joshua's father in which he promised to cooperate in various measures designed to protect Joshua, evidence of serious child abuse continued to accumulate. Indeed, after learning of the injuries that were the subject of the lawsuit, one social worker said, " " 'I just knew the phone would ring some day and Joshua would be dead.' " " *Id.* at 209, 109 S.Ct. at 1010 (Brennan, J., dissenting). Nonetheless, this evidence did not prompt the department to take further action.

The *DeShaney* Court ruled, however, that Joshua was not protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, which provides that "[n]o State shall * * * deprive any person of life, liberty, or property, without due process of law." The Court reasoned as follows:

> [N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means * * * * Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

*Id.* at 195–96, 109 S.Ct. at 1003. The Court summarized by saying, "As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004. The Court distinguished cases in which it had required the state to provide services on the ground that:

[T]hey stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being * * * * The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 199–200, 109 S.Ct. at 1005. That rationale did not apply in *DeShaney* because "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them." *Id.* at 201, 109 S.Ct. at 1006; *see California First Bank v. State*, 111 N.M. 64, 75–76, 801 P.2d 646, 657–58 (1990).

Here, Probationer's freedom may have been restricted by his conditions of probation, but Victim's freedom of action was not limited by the State. Therefore, the alleged failure of the State to protect Victim did not violate the Due Process Clause of the Federal Constitution.

We are supported in our view by cases from other jurisdictions that have considered similar situations. *See Henke v. Superior Court*, 161 Ariz. 96, 775 P.2d 1160 (Ct.App.1989) (*DeShaney* bars civil rights claim by children who were molested by paroled child molester); *Garcia v. Superior Court*, 50 Cal.3d 728, 268 Cal.Rptr. 779, 789 P.2d 960 (Cal.1990) (en banc) (*DeShaney* bars civil rights claim based on killing of woman by paroled convicted murderer); *Dimas v. County of Quay, N.M.*, 730 F.Supp. 373 (D.N.M.1990) (Parker, J.) (no cause of action under Section 1983 for victim of rape by prisoner on work release); *Lee v. Gateway Inst. & Clinic*, 732 F.Supp. 572 (W.D.Pa.1989) (no cause of action under Section 1983 based on killing by released mental patient), *aff'd*, 908 F.2d 963 (1990).

Post–*DeShaney* cases in which courts have held that a cause of action has been stated for injury caused by a person in state custody have involved victims whose freedom of action was restricted by the government. *Cornelius v. Town of Highland Lake, Ala.*, 880 F.2d 348 (11th Cir. 1989) (inmates on work release injured town clerk at her place of work), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990); *Swader v. Virginia*, 743 F.Supp. 434 (E.D.Va.1990) (inmate attacked child of prison employee who was required to maintain residence on prison property); *see Wood v. Ostrander*, 879 F.2d 583 (9th Cir.1989) (officer stranded plaintiff in high-crime area late at night by having plaintiff's car towed), *cert. denied*, —— U.S. ——, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990). *But see de Jesus Benavides v. Santos*, 883 F.2d 385 (5th Cir. 1989) (no cause of action under Section 1983 for jailer injured by inmate).

We hold that Plaintiff failed to state a claim for relief under Section 1983.

STATE TORT CLAIMS ACT

Plaintiff also seeks relief under the New Mexico Tort Claims Act. Under the Act, public employees acting within the scope of duty are granted immunity from liability for any tort except as waived by the Act. § 41–4–4(A). The only basis for waiver suggested by Plaintiff is NMSA 1978, Section 41–4–12 (Repl.Pamp.1989), which waives immunity for certain conduct by law enforcement officers while acting within the scope of their duties. The Tort Claims Act defines "law enforcement officer" as:

[A]ny full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes, or members of the national guard when called to active duty by the governor[.]

NMSA 1978, § 41–4–3(D) (Cum.Supp.1991).

New Mexico precedents have stated that this definition includes the county sheriff, his deputies, and jailers at the county jail, *Methola v. County of Eddy*, 95 N.M. 329, 622 P.2d 234 (1980), and the director of a county detention center, *Abalos v. Bernal-*

*illo County Dist. Atty.'s Office,* 105 N.M. 554, 734 P.2d 794 (Ct.App.1987), but does not include the state secretary of corrections and the warden of the state penitentiary, *Anchondo v. Corrections Dep't,* 100 N.M. 108, 666 P.2d 1255 (1983). The United States District Court for the District of New Mexico has held that guards at the state penitentiary are not law enforcement officers within the meaning of the state Tort Claims Act. *Osborn v. Governor of N.M.,* Civil 80–178 (1983) (Campos, J.). Defendants have also cited to us an unpublished memorandum opinion and calendar notice issued by this court, but these have no precedential value and should not have been cited. SCRA 1986, 12–405(C); *State v. Gonzales,* 110 N.M. 218, 794 P.2d 361 (Ct.App.1990), *aff'd,* 111 N.M. 363, 805 P.2d 630 (1991).

What are the duties of Defendants? Plaintiff relies on a statute that gives corrections department employees (which include probation and parole officers) certain powers of peace officers. NMSA 1978, Section 33–1–10 (Repl.Pamp.1990), states in pertinent part:

A. * * * [A]ny employee of the corrections department who has at the particular time the principal duty to hold in custody or supervise any person accused or convicted of a criminal offense or placed in the legal custody or supervision of the corrections department, shall have the power of a peace officer with respect to arrests and enforcement of laws when on the premises of a New Mexico correctional facility or while transporting a person committed to or under the supervision of the corrections department; when supervising any person committed to or under the supervision of the corrections department anywhere within the state; or when engaged in any effort to pursue or apprehend any such person. . . .

. . . .

C. As used in this section, "supervising" includes the performance of the following official duties by probation and parole officers of the corrections department:

(1) field investigations;

(2) surveillance;

(3) searches and seizures conducted alone or in cooperation with a state or local law enforcement agency; and

(4) security during the course of a probation or parole revocation hearing or proceeding or any other hearing or appearance required by law.

Defendants rely largely on an affidavit by Defendant Martinez filed in the district court. Of course, once Defendants rely on matters outside the pleadings, their motion is no longer a proper motion to dismiss for failure to state a claim under SCRA 1986, 1–012(B)(6), but the motion can still be considered as one for summary judgment under SCRA 1986, 1–056. *See Transamerica Ins. Co. v. Sydow,* 97 N.M. 51, 54, 636 P.2d 322, 325 (Ct.App.1981). Because Plaintiff did not contest the affidavit, which was submitted to the district court three-and-a-half months before the hearing on the motion, we assume its truth for the purpose of reviewing the district court's order. *Cf. Santistevan v. Centinel Bank of Taos,* 96 N.M. 734, 737, 634 P.2d 1286, 1289 (Ct.App. 1980) ("To treat a motion to dismiss as a motion for summary judgment without permitting the adverse party a reasonable opportunity to present pertinent material is error."), *rev'd in part on other grounds,* 96 N.M. 730, 634 P.2d 1282 (1981).

The affidavit states:

2. My principal duties as a probation and parole officer consist of evaluating individuals convicted by the court to determine and recommend suitability for probation or incarceration, to provide community-based supervision of adult and juvenile parolees and adult probationers, and at the direction of the courts and the Adult and Juvenile Parole Boards to insure reintegration of clients into the mainstream of acceptable community behavior patterns and successful completion of probation or parole. . . .

3. * * * A probation and parole supervisor's principal responsibilities are to administer the operation of a district probation and parole office, to supervise and evaluate the performance of the staff of probation and parole officers and sup-

porting personnel, and to implement and maintain departmental policies and procedures.

Attached to the affidavit were the state personnel office job descriptions for probation and parole officers and for probation and parole supervisors. The job description for probation/parole officer is as follows:

PURPOSE

To evaluate individuals convicted by the courts, to determine and recommend suitability for probation or incarceration; to provide community based supervision of adult and juvenile parolees and adult probationers. At the direction of the courts and the adult and juvenile parole boards, to ensure reintegration of clients into the mainstream of acceptable community behavior patterns and successful completion of probation or parole.

RESPONSIBILITIES

Any one position may not include all of the duties listed nor do the listed examples include all of the duties which may be found in positions of this class.

Under general guidance and direction, incumbents-

1. document activities and communication with clients;

2. provide all clients with counseling, crisis intervention and assistance in job seeking and placement;

3. provide juvenile clients with counseling and assistance related to family relations, school performance and suitable uses of free time;

4. plan and administer programs of intensive supervision and services for special clients identified by an objective needs and risk assessment;

5. refer clients to other agencies for needed services;

6. participate in other agencies' staffing of shared cases;

7. monitor clients' progress and general conduct;

8. enforce conditions of probation or parole;

9. investigate, prepare and write social reports and investigative reports;

10. interview witnesses and victims;

11. coordinate and participate in violation hearings;

12. testify before courts and parole boards;

13. classify clients by risks, needs, and client management classification system;

14. make visits to client's home, place of employment and place of incarceration or hospitalization;

15. schedule and conduct urinalysis and breath analyzer tests as required[.]

The job description for probation/parole supervisor states:

PURPOSE

To administer the operations of a district office: to supervise and evaluate the performance of a staff of probation/parole officers and supporting personnel: to implement and maintain departmental policies and procedures.

RESPONSIBILITIES

Any one position may not include all of the duties listed nor do the listed examples include all of the duties which may be found in positions of this class.

Under general guidance and direction, incumbents-

1. oversee the operations of a district probation/parole office

2. prepare, justify and administer a district office budget;

3. review and approve all work products generated for the courts, parole boards and other agencies;

4. implement all policies and procedures of the department and field services division;

5. assume temporarily the duties of either probation/parole officers or area supervisor during their absence;

6. approve requests for all types of employee leave;

7. assign work to probation/parole officers and supporting personnel;

8. conduct monthly caseload audits;

9. conduct statistical analyses;

10. prepare and write monthly statistical reports;

11. supervise a caseload of clients, as required;

12. prepare and write presentence reports, violation reports and other reports on caseloads as required;

13. maintain a district office log of arrests;

14. interview, select and hire probation/parole officers and supporting personnel;

15. train probation/parole officers and supporting personnel;

16. call, coordinate and conduct meetings;

17. attend court hearings and parole board hearings;

18. have frequent contact with offenders who are under the legal control of the Corrections Department; and

19. perform other related work as required[.]

The question before us is whether the principal duties of Defendants are those set forth in the statutory definition of "law enforcement officer." In particular, are Defendants' principal duties: (1) "to hold in custody any person accused of a criminal offense," (2) "to maintain public order," or (3) "to make arrests for crimes"? § 41-4-3(D). We note that "principal duties" are "those duties to which employees devote the majority of their time." *Anchondo*, 100 N.M. at 110, 666 P.2d at 1257. Also, the language of the definition is to be read in light of the traditional duties of law enforcement officers. *Id.* We consider in turn each of the three duties mentioned in the statutory definition.

■ Although for some purposes one might say that a probationer or parolee is in state custody, *see* NMSA 1978, § 31-21-10(D) (Repl.Pamp.1990) (person on parole remains in the "legal custody of the institution from which he was released"), probation and parole officers do not hold their clients in custody within the traditional meaning of the term as applied to law enforcement officers. We note that the statute relied upon by Plaintiff, Section 33-1-10, distinguishes between holding a person in custody and supervising a person.

Supervising is what probation and parole officers do. Similarly, our criminal statutes distinguish (1) assisting in the escape of a person held in lawful custody or confinement, NMSA 1978, § 30-22-11 (Repl.Pamp.1984), from (2) aiding or encouraging a person to abscond from parole or probation, NMSA 1978, § 30-22-18 (Repl.Pamp.1984). None of the responsibilities set forth in Defendants' job descriptions refers to restricting the freedom of movement of clients. At best, holding persons in custody is a minor incident of Defendants' jobs. Moreover, the statutory definition refers to holding in custody any person *"accused* of a criminal offense." § 41-4-3(D) (emphasis added). Persons on probation or parole have already been convicted. Those who have been convicted are not ordinarily referred to as "accused." For this reason, the United States District Court for the District of New Mexico held that prison guards do not come within the definition of law enforcement officers under the Tort Claims Act. *Osborn v. Governor of N.M.* We agree that a person who has been convicted is no longer an "accused" for the purposes of Section 41-4-3(D).

Maintenance of public order also is only incidental to the duties of probation and parole officers. Their chief function is rehabilitation. As stated in NMSA 1978, Section 31-21-4 (Repl.Pamp.1990):

The Probation and Parole Act [31-21-3 to 31-21-19 NMSA 1978] shall be liberally construed to the end that the treatment of persons convicted of crime shall take into consideration their individual characteristics, circumstances, needs and potentialities as revealed by case study, and that such persons shall be dealt with in the community by a uniformly organized system of constructive rehabilitation under probation supervision instead of in an institution, or under parole supervision when a period of institutional treatment is deemed essential in the light of the needs of public safety and their own welfare.

Although one would hope that the efforts of probation and parole officers would im-

prove public order by helping probationers and parolees to become good citizens, the same could be said of the efforts of those employed in education and social services. As previously noted, we are to construe the phrase "maintain public order" as it has been traditionally interpreted in the law enforcement context. Insofar as probation and parole officers maintain public order by trying to rehabilitate their clients, they are not maintaining public order in the same sense that police officers, sheriff's deputies, and other traditional law enforcement officers are said to maintain public order. We therefore hold that maintenance of public order, within the meaning of Section 41-4-3(D), is not a principal duty of probation and parole officers or their supervisors.

Finally, although probation and parole officers have some powers of arrest beyond those of other citizens, *see* § 33-1-10, the exercise of this power is not even mentioned specifically in Defendants' job descriptions. Making arrests for crime is not a principal duty of Defendants.

Taken all together, holding in custody persons accused of criminal offenses, maintaining public order, and making arrests for crime do not constitute duties to which Defendants are to devote the majority of their time. Thus, we hold that the district court properly ruled that Defendants were not law enforcement officers under Section 41-4-3(D) and that therefore the waiver of immunity in Section 41-4-12 does not apply to them.

CONCLUSION

We affirm the judgment of the district court.

IT IS SO ORDERED.

PICKARD and BLACK, JJ., concur.