2008-NMCA-163

198 P.3d 370

**Walter Patrick LIMACHER, George Luevano, Wilhelmina H. Luevano, and Joe Sanchez, Plaintiffs–Appellants,**

v.

**Jalayne SPIVEY and State of New Mexico, Defendants–Appellees.**

No. 26,770.

Court of Appeals of New Mexico.

Sept. 12, 2008.

Certiorari Denied, No. 31,353, Nov. 4, 2008.

Peter B. Shoenfeld, P.A., Peter B. Shoenfeld, Santa Fe, NM, for Appellants.

Walz and Associates, Jerry A. Walz, Cedar Crest, NM, for Appellees.

**OPINION**

KENNEDY, Judge.

{1} Plaintiffs Walter Limacher, George Luevano, Wilhelmina Luevano, and Joe Sanchez appeal from a district court order granting summary judgment to Defendants Jalayne Spivey and The State of New Mexico. The district court granted summary judgment for Defendants on the basis of sovereign immunity. We hold that there is no disputed material fact as to whether an employee of the Office of the State Engineer engaged in conduct sufficient to trigger the "law enforcement officer" waiver of immunity so as to defeat summary judgment, and we affirm.

## PROCEDURAL HISTORY

{2} This appeal arises from a tort action and other claims brought by water rights owners and irrigators in Lincoln County. Plaintiffs alleged that a number of defendants participated in a scheme to prevent them from accessing their water rights on the Rio Ruidoso. The complaint included allegations of malicious abuse of process, violation of civil rights, and unlawful taking. The State of New Mexico and Jalayne Spivey were among the defendants. Spivey was employed by the Roswell District Office of the State Engineer of New Mexico as a Water Resource Specialist II and Supervisor of the Hondo Basin. The defendants filed a motion for summary judgment. The district court denied the motion initially but granted a second motion for summary judgment in favor of Spivey and the State only (Defendants) on the basis of sovereign immunity. Plaintiffs appeal this grant of the motion for summary judgment.

## FACTS

{3} Plaintiffs own water rights in the Rio Ruidoso and have an adjudicated point of diversion. This appeal stems from a dispute over a dam across the Rio Ruidoso constructed by Plaintiffs in the summer of 2001 for the purpose of diverting water into the F. Hilbern Ditch. Water had been diverted into the ditch by means of the dam, which extended from bank to bank and consisted of rocks, wooden poles, and a plastic tarp. The dam was on Michael Hurd's land at the point of diversion and successfully channeled the entire flow of the Rio Ruidoso into the ditch.

{4} Subsequently, Spivey received several phone calls complaining that there was no flow of water in the Rio Ruidoso below the diversion point for the Hilbern Ditch. Paul Saavedra, Director of the Water Rights Division of the Office of the State Engineer in Roswell, also received numerous phone calls from downstream water rights owners complaining of the lack of water. Apparently Hurd removed the dam, which led to a confrontation between him and Limacher on July 11, 2001 at Hurd's gallery. Limacher became irate and said he was going to call the police, sue Hurd, and shoot "anybody who messed with his dam." Later that same day, Hurd went back to his gallery after closing and was confronted by Deputy Sheriff Patrick O'Brien in his police cruiser. The sheriff explained that he was there in response to a complaint by Limacher that his dam had been removed. The sheriff declined to take any action at that time because he was unsure about the law of water rights in the area. Instead, the sheriff asked Hurd to meet him the next morning after he had time to contact the Office of the State Engineer regarding this matter. The sheriff contacted Spivey later that evening, and she agreed to meet him and Hurd the next morning at the dam site. The next day Spivey confirmed that the dam had in fact been diverting all of the water flowing in the Rio Ruidoso. Spivey then conducted an investigation. She researched the appropriate files, interviewed several witnesses, and concluded that Limacher had no permit or other legal authority to construct a dam that diverted the entire flow of the river into his ditch. Hurd, Spivey, and Sheriff O'Brien then attempted to explain the situation to Limacher, who quickly became highly confrontational. Limacher stated in his deposition that he refused to remove the dam and warned that "historically people got shot over fooling with water rights."

{5} Based on the results of Spivey's investigation, Saavedra issued a Compliance Order dated July 16, 2001. The order stated that the diversion of water was in excess of the allowance, constituted a waste of water, and thus violated NMSA 1978, Section 72–8–4 (1973). The Compliance Order, a letter from Saavedra, and a copy of Chapter 143, Laws of 2001 were served on Hurd, instructing him to breach the diversion dam on his property by July 20, 2001, and return the ditch heading to its original state. On July 19, 2001, relying on the Compliance Order, Hurd's employees removed the dam. Later on the same day Spivey delivered a copy of the Compliance Order to Limacher. Previously, Limacher had been given a key to the lock on the gate to the access road to Hurd's property, but after the dam was removed, Hurd changed the lock on the gate for purposes of deterring violent encounters and the rebuilding of the illegal dam.

{6} Extremely unhappy with the Compliance Order, Limacher sent a letter to the Lincoln County Sheriff on August 8, 2001 advising him that he planned to rebuild the dam. Limacher invited the sheriff or his officers to attend in an effort to keep the peace. The next day, Plaintiff George Luevano advised the Office of the State Engineer in Roswell that the dam would be rebuilt on August 10, 2001, and that the Sheriff's department had been invited to attend. On August 10, 2001, Plaintiffs Limacher, Sanchez, Luevano, and others cut the lock on the gate and proceeded in trucks down the road on Hurd's property to rebuild the dam. Shortly thereafter, Deputy Cramer and another officer responded to a complaint from one of Hurd's employees that Limacher and several others in trucks had cut the lock and were proceeding to rebuild the dam. When Deputy Cramer arrived at the gate, he observed that the lock had been cut. He then telephoned the Office of the State Engineer to get Spivey's confirmation that the Compliance Order had been issued and was in effect. After Spivey confirmed that the Compliance Order was valid, the deputies entered the property and observed Limacher and others rebuilding the dam. Deputy Cramer informed the men that they needed to leave because they were trespassing. Limacher refused to leave and was arrested.

## DISCUSSION

### Standard of Review

{7} The question presented on appeal is whether there exist issues of material fact from which it could be found that Spivey, as an employee/assistant of the State Engineer and supervisor of the Hondo Basin's water rights administration, falls within the law enforcement exception under the New Mexico Tort Claims Act (NMTCA), NMSA 1978, Section 41–4–3(D) (2007). The district court found no issues of material fact and granted summary judgment for Defendants.

{8} Summary judgment is warranted where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Rule 1–056(C) NMRA, *Baptiste v. City of Las Cruces*, 115 N.M. 178, 179, 848 P.2d 1105, 1106 (Ct.App.1993). We review a grant of summary judgment de novo. *Fikes v. Furst*, 2003–NMSC–033, ¶ 11, 134 N.M. 602, 81 P.3d 545 (citing *McGarry v. Scott*, 2003–NMSC–016, ¶ 5, 134 N.M. 32, 72 P.3d 608). Summary judgment is a drastic remedy to be used with great caution and is appropriate only where there is no genuine issue of material fact and when the moving party is entitled to a judgment as a matter of law. *DiMarco v. Presbyterian Healthcare Servs., Inc.*, 2007–NMCA–053, ¶ 6, 141 N.M. 735, 160 P.3d 916 (citing *Garcia–Montoya v. State Treasurer's Office*, 2001–NMSC–003, ¶ 7, 130 N.M. 25, 16 P.3d 1084). In determining whether a factual dispute exists, courts must resolve all reasonable inferences in favor of the nonmovant and must read the pleadings, affidavits, depositions, answers to interrogatories, and admissions in the light most favorable to a trial on the merits. *Garcia–Montoya*, 2001–NMSC–003, ¶ 7, 130 N.M. 25, 16 P.3d 1084 (citing *Carrillo v. Rostro*, 114 N.M. 607, 615, 845 P.2d 130, 138 (1992)).

### Analysis

{9} Whether or not Spivey is a "law enforcement officer" under the NMTCA is an issue of material fact. The NMTCA maintains sovereign immunity against tort claims for state governmental entities and public employees acting within the scope of their duties except where specifically waived. NMSA 1978, § 41–4–4 (2001). Here, Plaintiff seeks the benefit of the NMTCA waiver of sovereign immunity for tort claims involving the conduct of law enforcement officers. NMSA 1978, § 41–4–12 (1977). A law enforcement officer is defined in Section 41–4–3(D) as a "full-time salaried public employee of a governmental entity whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes[.]" This Court has construed this statutory language to be disjunctive. *Baptiste*, 115 N.M. at 180, 848 P.2d at 1107. That is, for a governmental employee to fall within the law enforcement exception, their principal duties under law must be any of those enumerated. *Id.* It is sufficient if one's principal duties are encompassed under any one of these prongs. *Id.*

{10} The statute in question that empowers Spivey as an employee and supervisor in the Office of the State Engineer states:

Any person, association or corporation interfering with or injuring or destroying any dam, ... or who shall interfere with any person or persons engaged in the discharge of duties connected therewith, shall be guilty of a misdemeanor, and shall also be liable for the injury or damage resulting from such unlawful act. The state engineer or any authorized assistant shall have *power to arrest any person offending against the provisions of this section, and deliver him to the nearest peace officer of the county. It shall be the duty of the person making the arrest to make complaint at once before the court having jurisdiction thereof. The state engineer, the water masters and their authorized assistants, and agents may enter upon private property for the performance of their respective duties, doing no unnecessary injury thereto.*

NMSA 1978, § 72–8–1(1953) (emphasis added).

{11} Though dating back to territorial times and surviving without significant amendment, this statute clearly gives employees of the State Engineer powers of the sort enumerated in Section 41–4–3(D). The power to make arrests and maintain public order are particularly relevant to the facts of this case. Behavior that would trigger such an exercise of power by employees of the State Engineer under this statute is precisely what normally triggers the exercise of the police function: breaches of the peace, destruction of property, and interference with public officers.

{12} Section 72–8–1 unambiguously gives Spivey the power to arrest. The cases, however, clearly distinguish powers from the duty to use them. Simply having the power to arrest was not sufficient to match the MVD director with the law enforcement exception in *Dunn v. State ex rel. Taxation and Revenue Dep't,* 116 N.M. 1, 4, 859 P.2d 469, 472 (Ct.App.1993), because the director's duties were of an administrative nature.

{13} Although maintaining public order is not clearly defined in the statute, case law has interpreted the phrase to mean essentially the same thing as handling breaches of the peace. *Baptiste,* 115 N.M. at 180–81, 848 P.2d at 1107–08. This Court noted in *Baptiste* that "maintaining public order can be accomplished without the power to arrest." *Id.* at 180, 848 P.2d at 1107.

{14} When deciding whether a particular employee is a law enforcement officer as defined in Section 41–4–3(D), our jurisprudence tells us to first look to the statutory definition of that particular employee's duties and then determine whether the employee's primary duties match any of the statutory criteria. *See, e.g., Fernandez v. Mora–San Miguel Elec. Coop., Inc.,* 462 F.3d 1244, 1251 (10th Cir.2006). It is an employee's primary duties that are the crux of the inquiry. *Id.* In making this determination, we adhere to the concept of traditional law enforcement activities. *Anchondo v. Corr. Dep't,* 100 N.M. 108, 110, 666 P.2d 1255, 1257 (1983). These traditional activities include "preserving the public peace, preventing and quelling public disturbances, [and] enforcing state laws, including but not limited to the power to make arrests for violation of state laws." *Id.* However, since an exhaustive list of what constitutes traditional law enforcement does not exist, this vague language leaves considerable room for differing interpretations. This Court has noted that duties traditionally performed by law enforcement officers are "admittedly amorphous." *Coyazo v. State,* 120 N.M. 47, 50, 897 P.2d 234, 237 (Ct.App. 1995). "Determination in each case is fact specific, but informed by a practical, functional approach as to what law enforcement entails today." *Id.* at 51, 897 P.2d at 238.

{15} In *Anchondo,* our Supreme Court held that both the Secretary of Corrections and the warden of a New Mexico state penitentiary were not law enforcement officers within the meaning of the NMTCA. 100 N.M. at 109–10, 666 P.2d at 1256–57. The Court reasoned that the Secretary of Corrections (Secretary) was not a law enforcement officer because he was a member of the executive cabinet headed by the governor and because his enumerated statutory duties were more of the administrative nature than of the traditional law enforcement nature.

*Id.* at 109, 666 P.2d at 1256. With respect to the warden, the Court had different reasoning as to why he did not fit the law enforcement exception. Although the warden had all the powers and duties enumerated in the laws involved, the carrying out of those duties and powers was subject to the direction and supervision of the Secretary, and the Secretary retained final decision-making authority and responsibility. *Id.* Further, the duties that qualify an employee for the exception of maintaining public order must be traditional law enforcement duties that directly impact public order. *Dunn v. McFeeley,* 1999–NMCA–084, ¶ 25, 127 N.M. 513, 984 P.2d 760.

{16} New Mexico courts have found non-police employees of the state to fit the law enforcement exception of the NMTCA on a few occasions where their jobs involve holding persons accused of crime. In *Abalos v. Bernalillo County District Attorney's Office,* 105 N.M. 554, 734 P.2d 794 (Ct.App.1987), a woman brought suit against the director of the Bernalillo County Detention Center (BCDC), alleging his responsibility for her rape by an individual that he negligently released from the BCDC. We determined that there was a close parallel between jail administrators and sheriffs, *id.* at 560, 734 P.2d at 800, in that the director of the BCDC is no different than a county sheriff and that his principal duties were to hold in custody persons accused of criminal offenses. *Id.* Similarly, the Eddy County sheriff, his deputies, and the jailers employed by the City of Albuquerque were alleged to have negligently placed prisoners in hostile environments causing them physical injuries. *Methola v. County of Eddy,* 95 N.M. 329, 332, 622 P.2d 234, 237 (1980). The plaintiffs in *Methola* attempted to bring these state employees within the scope of the law enforcement exception. *Id.* Our Supreme Court held that a jailer is charged with both the duty to maintain public order and the duty to hold persons accused in custody. *Id.* Likewise, the sheriff, deputies, and jailers were all deemed to be law enforcement officers within the meaning of the NMTCA. *Id.* at 334, 622 P.2d at 239.

{17} In cases where primary job duties do not encompass the arrest and detention of accused persons, the courts have generally exempted the positions from inclusion in the law enforcement officer exception of the NMTCA. Parole and probation officers have not met the law enforcement exception according to New Mexico courts. In *Vigil v. Martinez,* 113 N.M. 714, 832 P.2d 405 (Ct. App.1992), this Court held that parole and probation officers' primary duties were rehabilitation, that they dealt with persons already convicted, and that nothing in their job description referred to restricting the freedom of clients, *id.* at 720, 832 P.2d at 411, as opposed to a law enforcement officer whose duties included holding in custody persons accused.

{18} Two other cases found a district attorney (DA) and the chief investigator employed by the DA not to fit the law enforcement exception. In *Coyazo,* the plaintiff attempted to argue that the DA's office fit the law enforcement exception through the NMTCA's prong of "maintaining public order." 120 N.M. at 49, 897 P.2d at 236. This Court rejected the invitation to stretch the definition of law enforcement officer in this situation. *Id.* at 49–50, 897 P.2d at 236–37. We again distinguished this job from the common activities of an officer on patrol because the DA did not hold people accused or make arrests on a day-to-day basis. *Id.* In *Fernandez,* the chief investigator of the DA's office was held not to be a law enforcement officer under the NMTCA because his main job was to simply assist attorneys in the preparation of preliminary hearings and trial. 462 F.3d at 1251–52. Likewise, his primary duties did not match any of the three exceptions under the NMTCA: holding persons in custody, maintaining public order, or making arrests for crimes. *Id.* at 1252. Further, in *Dunn v. McFeeley,* we declined to extend the law enforcement waiver under the NMTCA to police crime laboratory personnel, police crime scene investigators, or medical investigators because they did not fit the mold of "traditional law enforcement officers and those whose duties are clearly encompassed by statutory defini-

tion." *Id.*, 1999–NMCA–084, ¶ 25, 127 N.M. 513, 984 P.2d 760.

{19} None of these cases answers the question presented by the unique facts in this case. The concurring opinion in *Dunn v. McFeeley* argued that "our case law ... has unduly narrowed the concept of law enforcement under the Tort Claims Act" by focusing on the activities of officers on the street and ignoring the danger of a "technical investigation ... handled recklessly" that in turn results in an improper prosecution. *Id.* ¶ 28 (Bustamante, J., concurring). The distinction between administrative and law enforcement duties is not easily made under Section 72–8–1. For example, Saavedra stated in deposition that Spivey's duties included both administration and enforcement regarding water rights. During a deposition, Spivey testified to a number of administrative duties under the generally stated main duty of administration of water laws, which included doing field investigations for compliance and complaints. Given these facts, the context of water law, and the context of Section 72–8–1, Spivey exercised her statutory powers in a way that resembles hands-on law enforcement. Here, Spivey directly impacted Limacher's property rights, causing the destruction of a dam that diverted water to which he unequivocally had some right. She enforced water laws exclusive of any process other than her own discretion and that of her supervisor. Given Spivey's defined statutory duties, her use of the statutory power to exercise them unilaterally, and the unresolved nature of water rights in New Mexico, we look closely for sufficient material facts in dispute to defeat summary judgment in this case.

{20} Water issues have been central to life in New Mexico for hundreds of years, and proper administration of water rights in New Mexico is absolutely vital to maintaining the public order. We believe that courts should consider the public order prong of the law enforcement exception in addition to focusing on a statutory power to arrest.

{21} When the first altercation between Limacher and Hurd erupted, the sheriff declined to act, deferring to the specific jurisdiction and expertise of the State Engineer in matters concerning water rights. Spivey has statutory power to enter onto private property to fulfill her duties without a warrant. In this case, she undertook the destruction of Plaintiffs' dam under color of Saavedra's Compliance Order without prior notification to Plaintiff or prior judicial process, in service of statutory proscriptions against interfering with water rights. It is not clear who would enforce water rights in the Hondo Basin in her absence. It is also important to distinguish these facts from those of *Anchondo* where, although the warden had all the powers and duties enumerated in the laws involved, the execution of those duties and powers was subject to the direction and supervision of the Secretary, who retained final decision-making authority and responsibility. 100 N.M. at 109, 666 P.2d at 1256. In contrast, Spivey is a Water Resources Specialist II empowered to act unilaterally with respect to water rights administration in the Hondo Basin as suggested in Section 72–8–1 and evidenced by the fact that the Compliance Order to alter property was issued based solely on her independent field investigation. Essentially, the State Engineer acting through Spivey's investigation ordered Hurd, who owned the land where the dam was located, to destroy the dam diverting Rio Ruidoso water to the Hilbern Ditch without any other intermediaries or judicial process. Although Spivey did have to go through Saavedra to obtain the Compliance Order, it was issued based solely on the results of her investigation, and Plaintiff Limacher was given no opportunity to respond or appeal, having been served with the Order after Hurd's employees removed the dam. Likewise, because the statute gives Spivey substantial law enforcement duties and the power to arrest for a criminal (misdemeanor) offense, she arguably fits within the law enforcement exception in the NMTCA.

{22} *Dunn v. State*, however, offers an example in which a state employee fell outside the scope of the law enforcement exception in the NMTCA. The plaintiff, a motorist injured by an uninsured driver, attempted to sue the director of the MVD, alleging that while the tortfeasor was uninsured and her

driver's license was suspended, the MVD processed her motor vehicle registration without requiring documentation. *Id.,* 116 N.M. at 2–3, 859 P.2d at 470–71. This Court examined the director's statutory duties and determined that although the director had the power to make arrests and preserve peace, his duties involved principally administrative matters. *Id.* at 4, 859 P.2d at 472. This Court further determined that the director did not serve as a full-time law enforcement officer whose principal duties were holding in custody persons accused of criminal offenses, or maintaining public order, or making arrests for crimes. *Id.*

{23} We agree with this approach, and we reiterate that for an employee to fall within the exception for maintaining public order, that person's duties must be traditional law enforcement duties that directly impact public order, *Dunn v. McFeeley,* 1999–NMCA–084, ¶ 25, 127 N.M. 513, 984 P.2d 760, and that traditional law enforcement duties include preserving the public peace, preventing and quelling public disturbances, and enforcing state laws, including but not limited to the power to make arrests for violation of state laws. *Anchondo,* 100 N.M. at 110, 666 P.2d at 1257. Even though Spivey did have the statutory power to arrest, and even though Saavedra's deposition established her duties as equivalent to those of a law enforcement officer in that she policed water, we also must look at the age of the statute and the fact that in Saavedra's twenty-seven years on the job he had no knowledge of an arrest having been made by a State Engineer employee.

{24} In the face of calls to expand our horizons of liability for law enforcement, *Dunn v. McFeeley,* 1999–NMCA–084, ¶ 28, 127 N.M. 513, 984 P.2d 760, we cannot hold that Spivey's duties, old statutes aside, qualify her as a law enforcement officer for purposes of waiving sovereign immunity under the NMTCA. Besides, the sheriff arrested Plaintiff for his behavior at the scene, not for building the dam. We therefore hold that the district court properly found that no question of material fact existed as to whether Spivey fits the law enforcement exception. We agree with the district court's findings that even if Spivey had police-like power under statutory authority, she had never actually arrested anyone, her duties were mainly administrative, she had no law enforcement certification, she did not carry a gun, and her vehicle did not have police emergency lights. Based on the undisputed facts of this case, summary judgment was appropriate.

## CONCLUSION

{25} We affirm the district court in holding that there is no genuine issue of material fact as to whether the conduct of an employee of the Office of the State Engineer triggered the "law enforcement officer" waiver of immunity so as to defeat summary judgment.

{26} **IT IS SO ORDERED.**

I CONCUR: IRA ROBINSON, Judge.

MICHAEL D. BUSTAMANTE, Judge (concurring in result).