Lydia **LEYBA** and Lawrence Trujillo, as co-personal representatives of the Estate of Robert Dominguez, deceased, Plaintiffs,

v.

**CITY OF SANTA FE; Charles A. Laramie, II; Raymond J. Rael; Board of County Commissioners of Santa Fe County; Santa Fe Regional Emergency Communications Center Board of Directors; Robert Eagan; Judith Eagan; Livewatch Security LLC d/b/a Safemart; and Does I-V; Defendants.**

**CV 16-185 WPL/LF**

United States District Court,
D. New Mexico.

Filed August 3, 2016

Mark H. Donatelli, John C. Bienvenu, The Rothstein Law Firm, Kristina Martinez, Coberly and Martinez, LLLP, Santa Fe, NM, Carolyn M. Nichols, Maggie H. Lane, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg & Bienvenu, LLP, Albuquerque, NM, for Plaintiffs.

James P. Sullivan, Christina L. Brennan, Brennan & Sullivan PA, Michael Dickman, Law Office of Michael Dickman, Jeffrey E. Jones, Law Office of Jeffrey E. Jones, Santa Fe, NM, David W. Peterson, Michael G. Smith, Keleher & McLeod, PA, Albuquerque, NM, for Defendants.

## ORDER GRANTING SUMMARY JUDGMENT ON PLAINTIFFS' TORT CLAIMS ACT CLAIMS AGAINST THE COUNTY DEFENDANTS

William P. Lynch, United States Magistrate Judge

This lawsuit is based upon the accidental shooting of Robert Dominguez, the father of Plaintiffs, by Officer Charles Laramie of the Santa Fe Police Department in the early morning hours of March 4, 2013. In their Second Amended Complaint, Plaintiffs have sued Officer Laramie, his supervisor, Chief of Police Raymond J. Rael, and his employer, the City of Santa Fe; the Board of County Commissioners of Santa Fe County (County) and Santa Fe Regional Emergency Communications Center Board of Directors (RECC Board); Robert and Judith Eagan, who owned the house where the shooting occurred; and LiveWatch Security, the Eagans' home alarm system company. At issue are the

motion for summary judgment filed by the County and RECC Board (collectively County Defendants) concerning Plaintiffs' first cause of action against them under the New Mexico Tort Claims Act (Doc. 21), and Plaintiffs' request under Federal Rule of Civil Procedure 56(d) for discovery to respond to the motion (Doc. 40).

Rule 56(d) allows a court to defer ruling upon or deny a summary judgment motion in order to permit further discovery if the nonmoving party states by affidavit that it lacks facts essential to oppose the motion. FED. R. CIV. P. 56(d). "The general principle of Rule 56[ (d) ] is that 'summary judgment [should] be refused when the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Price ex rel. Price v. Western Resources, Inc.*, 232 F.3d 779, 783 (10th Cir.2000) (citation omitted). While a party's Rule 56(d) application should be liberally treated, granting relief under Rule 56(d) rests within the trial court's discretion. *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1553–54 (10th Cir.1993); *Valley Forge Ins. Co. v. Health Care Management Partners LTD.*, 616 F.3d 1086, 1096 (10th Cir.2010).

In considering the motion for summary judgment, I must view the facts and the reasonable inferences from the facts in the light most favorable to Plaintiffs, the non-moving parties. *Cortez v. McCauley*, 478 F.3d 1108, 1126 (10th Cir.2007). When a motion for summary judgment is made and supported as provided in Federal Rule of Civil Procedure 56, an adverse party may not rest upon mere allegations or denials but must submit affidavits or other evidence that is more than simply "speculation, conjecture or surmise." *Self v. Crum*, 439 F.3d 1227, 1230 (10th Cir.2006) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir.2004)). When a party fails to submit specific and affirma-

tive evidence, whether by affidavit or as otherwise provided in Rule 56, to demonstrate a genuine issue of material fact exists, summary judgment is appropriate. *Island Software & Computer Serv., Inc. v. Microsoft*, 413 F.3d 257, 261–62 (2d Cir. 2005); *Pine Ridge Coal Co. v. Local 8377, United Mine Workers of Am.*, 187 F.3d 415, 421–22 (4th Cir.1999).

The Eagans live most of the year in Blaine, Washington, but they also own a house at 512 Johnson Lane in Santa Fe, New Mexico. Mr. Dominguez lived a few houses away from the Eagans' house, and the Eagans paid him to act as the caretaker for their house. The Eagans gave Mr. Dominguez a key to their house and permission to enter it while they were away. The Eagans also listed Mr. Dominguez as a "Notification-Only Contact" with their home alarm system company, LiveWatch Security. LiveWatch was to contact Mr. Dominguez in response to an alarm, but only after LiveWatch notified emergency services or in the event of a non-emergency.

Mr. Dominguez was shot by Officer Laramie when both he and Officer Laramie went to the Eagans' house after reports by LiveWatch to Mr. Dominguez and the Santa Fe Regional Emergency Communications Center (911 Center) that an alarm was going off at the house. Because the parties were able to obtain audio files of the calls made to and from the 911 Center and Officer Laramie's belt tape, there is not a great deal of dispute about the events prior to the shooting.

Mr. Dominguez was shot by Officer Laramie some time after 3:36 a.m. on March 4, 2013. Mr. Dominguez was awakened early that morning by a call from LiveWatch notifying him that an alarm was going off at the Eagans' house. Mr. Dominguez got up, dressed, and walked down the street to

the Eagans' house to check on it. He took a holstered gun with him as a precaution.

Livewatch called the 911 Center at 3:22 a.m. to notify it of the alarm at the Eagans' house. LiveWatch did not notify the 911 Center that it had already contacted Mr. Dominguez about the alarm, but instead told the 911 Center that it was still attempting to contact Mr. Dominguez. Mr. Dominguez arrived at the Eagans' house and entered the front door with his key. Officer Laramie arrived at 512 Johnson Lane at 3:35 a.m. One minute later, at 3:36 a.m., LiveWatch notified the 911 Center that it had received an additional alarm activation from the front entry of the house. At 3:36:35 a.m. Officer Laramie radioed the 911 Center to advise that the front door to the house was open. At 3:37:22 a.m. a dispatcher at the 911 Center who identified himself as "Nathan with the Santa Fe Police Department" contacted LiveWatch and asked if LiveWatch had been able to contact Mr. Dominguez. Live-Watch responded that it had contacted Mr. Dominguez but "it looks like he didn't give us any information." LiveWatch failed to inform the 911 Center that Mr. Dominguez had gone to the house. The 911 Center failed to inform Officer Laramie that Live-Watch had notified Mr. Dominguez about the alarm and that he may be present at the house.

When Officer Laramie approached the house, he could see inside the open door. He pointed his flashlight at Mr. Dominguez, identified himself as "Santa Fe Police," and asked Mr. Dominguez for his name. Mr. Dominguez responded by saying "Robert Dominguez." Shortly thereafter Officer Laramie shot Mr. Dominguez several times. Plaintiffs and Officer Laramie dispute whether Mr. Dominguez pointed his gun at Officer Laramie just prior to the shooting. Mr. Dominguez denied that he had pointed his gun at Officer Laramie. Plaintiffs assert that Officer Laramie has falsely claimed that Mr. Dominguez pointed his gun at him to justify the shooting.

The 911 Center is a governmental entity that was created by a joint powers agreement between the City of Santa Fe and the County in accordance with the Enhanced 911 Act, §§ 63–9–1 to 63–9–11.1, N.M.S.A. 1978. The 911 Center, located at 35 Camino Justicia, Santa Fe, receives all police, fire, and medical emergency and non-emergency calls for the City and the County, and dispatches the appropriate agency as necessary. The 911 Center employs 48 persons: 40 dispatchers and 8 administrative employees. The dispatchers must complete a three week curriculum (124 hours) and graduate from the Public Safety Telecommunicator Academy, which is conducted by the Basic Training Bureau within the Law Enforcement Academy, which is part of the New Mexico Department of Public Safety. None of the 911 Center's employees are certified peace officers or commissioned law enforcement officers. Training for police officer certification, which is required for commission as a law enforcement officer, is provided by the Basic Police Officer Training Academy within the Law Enforcement Academy, and includes 16 weeks of training, plus four hours of first aid and nine hours of CPR. Plaintiffs contend that the County Defendants are responsible for the acts or omissions of the 911 Center's dispatchers under principles of respondeat superior.

▄ The County Defendants argue that they are entitled to summary judgment for two reasons. First, they assert that there is no waiver of immunity under the New Mexico Tort Claims Act for the tort claims asserted against them. Second, they argue that the 911 Center and its employees are immune from liability under § 63-9D-10 of the Enhanced 911 Act.

Under the Tort Claims Act, public employees acting within the scope of their

duties are granted immunity for any tort except as waived by the Act. § 41-4-4(A). Plaintiffs claim that immunity is waived under § 41-4-12, which waives immunity for certain conduct by law enforcement officers while acting within the scope of their duties. As applicable here, the Tort Claims Act defines "law enforcement officer" as an officer "whose principal duties under law are to hold in custody any person accused of a criminal offense, to maintain public order or to make arrests for crimes." § 41-4-3(D). Plaintiffs admit that the 911 dispatchers do not hold persons in custody or make arrests for crimes, but they claim that the duties of the dispatchers include maintaining public order and preserving the peace, such that the dispatchers come within the waiver provision of § 41-4-12 and are subject to suit under that provision.

There is a well-developed body of New Mexico case law concerning whether certain defendants are law enforcement officers within the meaning of the Tort Claims Act. Somewhat surprisingly, neither Plaintiffs nor the County Defendants discuss *Rayos v. State*, 336 P.3d 428 (N.M.App. 2014), the most recent New Mexico case on this issue. In *Rayos*, the court was asked to determine whether State of New Mexico Department of Corrections probation and parole officers were "law enforcement officers" as that term is defined in the Tort Claims Act. *Id.* at 429. In making this determination, the court recognized that prior New Mexico decisions had construed the definition of law enforcement officer strictly. *Id.* at 431. To come within the immunity waiver for law enforcement officers, a defendant's "principal duties, those duties to which they devote a majority of their time, [must] be of a law enforcement nature." *Id.* (quoting *Weinstein v. City of Santa Fe*, 121 N.M. 646, 916 P.2d 1313 (1996)). Thus, a court "must determine the duties upon which the employee spends the majority of his or her time (principal

duties) and consider the character of those principal duties 'against the admittedly amorphous standard of the duties and activities traditionally performed by law enforcement officers.'" *Id.* (quoting *Coyazo v. State*, 120 N.M. 47, 897 P.2d 234 (N.M.App.1995)). According to the court, the chief function of probation and parole officers is rehabilitation. *Id.* at 432. Because rehabilitation is not a duty traditionally performed by law enforcement that directly impacts public order, rehabilitation does not fall within the category of "maintaining public order" to qualify probation and parole officers as "law enforcement officers" under the Act. *Id.* at 434. Although Plaintiff made several other arguments about how probation and parole officers qualify as "law enforcement officers" (*i.e.*, they engage in activities similar to traditional law enforcement officers, their training overlaps with the training of sheriff's deputies, Corrections Department policies and procedures deal extensively with the arrest powers of probation and parole officers, probation and parole officers self-identify as peace officers and are authorized to carry firearms in the field), the court rejected these arguments and affirmed the court's prior holding in *Vigil v. Martinez*, 113 N.M. 714, 832 P.2d 405 (N.M.App.1992) that probation and parole officers are not "law enforcement officers" for the purposes of the Tort Claims Act. *Id.* at 436.

*Rayos* is consistent with numerous other New Mexico cases that recognize that, to fall within the "maintain[ing] public order" category, a public employee's principal duties must be duties traditionally performed by law enforcement officers that directly impact public order. In *Dunn v. McFeeley*, 127 N.M. 513, 984 P.2d 760 (N.M.App.1999), plaintiff argued that a laboratory technician at the State Police Crime Laboratory who collected evidence at the murder scene and performed tests

at the lab came within the definition of "law enforcement officer" because he helped maintain public order. The court rejected this argument, concluding that, although his work helped maintain public order by leading to the apprehension and conviction of the guilty and exculpation of the innocent, that connection was too indirect to satisfy the statutory definition. *Id.* at 767. The court stated that, "[i]n interpreting the Tort Claims Act, our appellate courts have repeatedly found that a connection to law enforcement· activity, even being a member of the law enforcement team, is insufficient by itself to make one a law enforcement officer: the person's duties must directly impact public order." *Id.*

A similar result was reached in *Limacher v. Spivey*, 145 N.M. 344, 198 P.3d 370 (N.M.App.2008). In this case, plaintiff asserted that a water resource specialist with the State Engineer's Office who had enforcement duties regarding water rights, who by statute had the power to arrest individuals, and who "exercised her statutory powers in a way that resembled hands-on law enforcement" came within the law enforcement exception to the Tort Claims Act. *Id.* at 375. The court recognized that in cases where the defendant's "primary job duties do not encompass the arrest and detention of accused persons, [New Mexico] courts have generally exempted the positions from inclusion in the law enforcement officer exception" of the Tort Claims Act. *Id.* at 374. The court granted summary judgment to the water resource specialist on this issue, reiterating "that for an employee to fall within the exception for maintaining public order, that person's duties must be traditional law enforcement duties that directly impact public order." *Id.* at 376.

Other cases have reached similar results. *See Fernandez v. Mora–San Miguel Elec. Co-op., Inc.*, 462 F.3d 1244, 1251–52 (10th Cir.2006) (chief investigator for district attorney's office is not a law enforcement officer); *Ortega v. Madrid*, No. 00cv1414 JAP/RLP, Doc. 19 at 4–6 (D.N.M. Mar. 6, 2001) (unpublished) (New Mexico Attorney General is not a law enforcement officer as that term is used in the Tort Claims Act); *Coyazo v. State*, 120 N.M. 47, 897 P.2d 234, 236 (N.M.App.1995) ("We reject Coyazo's invitation to stretch the definition of 'law enforcement officer' to include district attorneys in their prosecutorial role.") In light of the New Mexico authority on this issue, I need not discuss Plaintiffs' out-of-state cases that do not consider waiver of immunity under the New Mexico Tort Claims Act or the statutory definition of "law enforcement officer."

Plaintiffs admit that the duties of the 911 Center's dispatchers involve receiving emergency and non-emergency calls and dispatching the appropriate agency as necessary, and that their duties do not include the arrest and detention of accused persons. Given these admissions, and the strict construction given by New Mexico courts to the definition of "law enforcement officer" under the Tort Claims Act, additional discovery on this issue is not necessary. *CenTra, Inc. v. Estrin*, 538 F.3d 402, 420 (6th Cir.2008) (quotation omitted) (a court may deny a Rule 56(d) motion if "further discovery would not have changed the legal and factual deficiencies.") Under New Mexico law, any impact of the dispatchers' duties on public order is only incidental and is "too indirect to satisfy the statutory definition." *Dunn*, 984 P.2d at 767. Therefore, § 41-4-12's waiver of immunity does not apply to this case.

Plaintiffs' claim that immunity is waived under § 41-4-6 fares no better. § 41-4-6 waives immunity for damages "caused by the negligence of public em-

ployees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." § 41-4-6 (A). This waiver, sometimes called the "building waiver," *Johnson ex. Rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1139 (10th Cir.2006), is not limited to physical defects in buildings, "as the words 'machinery' and 'equipment' reveal." *Bober v. New Mexico State Fair*, 111 N.M. 644, 808 P.2d 614, 623 (1991). Liability may arise under the statute "if negligent public employees operate or maintain a facility in such a way as to create an unsafe or dangerous condition on the property or in the immediate vicinity." *Leithead v. City of Santa Fe*, 123 N.M. 353, 940 P.2d 459, 461 (N.M.App.1997). Further, '[t]he waiver applies to more than the operation or maintenance of the physical aspects of the building, and includes safety policies necessary to protect the people who use the building." *Upton v. Clovis Municipal School Dist.*, 140 N.M. 205, 141 P.3d 1259, 1261 (2006). In contrast to the strict construction of the term "law enforcement officer" under § 41-4-12, New Mexico courts have construed the waiver in § 41-4-6 broadly. *Id.* at 1261.

The 911 Center dispatchers use the 911 emergency telephone system, mapping systems, computer-aided dispatch machines, radio systems and other office equipment while performing their duties. While Plaintiffs allege in their complaint that Mr. Dominguez was injured by negligence of the dispatchers in operating or maintaining their building, machinery, equipment or furnishings, they fail to specify what building, machinery or equipment was operated negligently or was otherwise dangerous. Plaintiffs failed to properly dispute the County Defendants' statement that there were no problems with the building or any of the equipment used by the dispatchers that night, and instead shifted to argue that the dispatchers failed

to follow appropriate safety procedures in utilizing their equipment and machinery. Yet Plaintiffs fail to identify the safety procedures that they contend the dispatchers should have followed. This case is not similar to *Upton*, where the Clovis School District negligently operated a middle school when it failed to follow safety procedures in place for health emergencies for students, or *Leithead*, where the City of Santa Fe negligently operated a swimming pool when lifeguards did not adequately perform duties that were essential to public safety at the pool. *Upton*, 141 P.3d at 1262; *Leithead*, 940 P.2d at 462–63. There is no waiver of immunity under § 41-4-6 because Plaintiffs have failed to demonstrate some dangerous condition in the building or its equipment or how the 911 Center was negligently operated or maintained.

■ Finally, the 911 Center and the dispatchers are immune from liability under the Enhanced 911 Act. This Act provides that 911 system employees are not liable for damages resulting from providing enhanced 911 systems or transmitting 911 calls "except for willful or wanton negligence or intentional torts." § 63-9D-10. Plaintiffs rely upon the New Mexico Uniform Jury Instruction on punitive damages, which defines willful conduct as "the intentional doing of an act with knowledge that harm may result" and wanton conduct as "the doing of an act with utter indifference to or conscious disregard for a person's safety." NM UJI 13–1826. Plaintiffs do not claim that the dispatchers acted intentionally to harm Mr. Dominguez, but assert that the dispatcher's conduct demonstrates utter indifference to the safety of Mr. Dominguez.

■ No New Mexico cases have applied or construed this statute. In construing the statute, my goal is "to determine and give effect to legislative intent." *Baker*

*v. Hedstrom*, 309 P.3d 1047, 1050 (N.M. 2013) (quotation omitted). In determining legislative intent, the primary indicator is the language of the statute. *Id.* A court must give the words used in the statute their ordinary meaning unless the legislature indicates a different intent. *State ex rel. Klineline v. Blackhurst*, 106 N.M. 732, 749 P.2d 1111, 1114 (1988).

It is easy to distinguish between actions that are intentional and those that are merely negligent. *Daniels v. Williams*, 474 U.S. 327, 335, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) ("More important, the difference between one end of the spectrum—negligence—and the other—intent—is abundantly clear."); *Trujillo v. Salazar*, 2006 WL 1228827 at *10 (D.N.M. Mar. 1, 2006) (citing *Ledbetter v. Webb*, 103 N.M. 597, 711 P.2d 874 (1985)). Conduct that lies somewhere between negligence and intentional acts has presented more challenges to the courts. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (U.S.1994) ("[D]eliberate indifference [lies] somewhere between the poles of negligence at one end and purpose or knowledge at the other," and has been equated with recklessness, a term that itself "is not self-defining"); *Daniels*, 474 U.S. at 334, 106 S.Ct. 662 (Requiring plaintiffs "to allege something more than negligence could raise serious questions about what 'more' than negligence—intent, recklessness or 'gross negligence'—is required, and indeed about what these elusive terms mean."); *Jendusa–Nicolai v. Larsen*, 677 F.3d 320, 322 (7th Cir.2012) ("[W]e have discovered to our surprise that courts are all over the lot in defining" the phrase "willful and malicious" in section 523(a)(6) of the bankruptcy code); *Craig v. Driscoll*, 262 Conn. 312, 813 A.2d 1003, 1022 (2003) (quotation omitted) ("Recklessness ... is more than negligence, more than gross negligence.... While we have attempted to draw definitional distinctions between the terms willful, wanton or reckless, in prac-

tice the three terms have been treated as meaning the same thing. .... [It is] such aggravated negligence [that] must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention")

As reflected in § 63-9D-10, the New Mexico legislature concluded that a negligence standard would operate too harshly on enhanced 911 systems and their employees. Because the meaning of a legal term can vary from one context to another, the definition of willful or wanton misconduct appropriate for the recovery of punitive damages may not be the appropriate definition under the Enhanced 911 Act. Whatever the legislature meant by the terms "willful or wanton negligence or intentional acts," it obviously meant some sort of aggravated misconduct more culpable than mere negligence. Because Plaintiffs' allegations that the dispatchers failed to notify Officer Laramie that Mr. Dominguez might be at the Eagans' house do not rise above the level of mere negligence, the County Defendants are immune from liability under § 63-9D-10 of the Enhanced 911 Act.

Accordingly, Plaintiffs' Rule 56(d) motion for discovery is denied, and the County Defendants' motion for summary judgment on Plaintiffs' first cause of action is granted.

IT IS SO ORDERED.